Sacramento Municipal Utility v. United States Mr. McDonald. May it please the court, Tim McDonald on behalf of the plaintiff appellant, the Sacramento Municipal Utility District, which I and everyone else will refer to as SMUD, and I'll do that here. There's a fairly long procedural history, your honors, and I will not go through and set forth in our briefs as well as opinions of this court and the trial court below, and I'll focus- Some of this has been around for some of that history. That's right, your honor. I'll go right to the merits, and this is a case about collateral estoppel, and we think there are at least five independent reasons that the trial court's application of collateral estoppel to impose a $35 million offset on SMUD's proven damages is in error. I'll address each one of those in turn. First, the first element of collateral estoppel is it can only apply if the issue in the first case and the second case are identical. This court has said materially identical in all respects, so let's look at that issue. The issue in the first case was whether or not the government was entitled to a wet pool offset, a wet pool offset for the year 2003. The issue in the second case is whether the government was entitled to a wet pool offset, this is a hypothetical world offset, a wet pool offset for the years 2004. The years are different, the time frame is different, but didn't the law change as well? Yes, your honor, that's exactly right. We think that's an independent basis for reversal of trial court's decision, and the law changed in two material respects between SMUD 1 and SMUD 2. First, the first change in law was this court's adoption of the 1987 ACR as the non-breach world acceptance rate. The court did that in the Pacific Gas and Electric case from 2008. That's a fundamental change, this court changed the framework. And in the follow-on case to PG&E in 2012, and the follow-on case to Yankee Atomic in 2012, this court recognized that the adoption of the 1987 ACR was a fundamental change in the factual predicate against how you measure the non-breach world. So that's a change in the law, and importantly, it's a change in the law that directly rejected the trial court's finding in the first case that the acceptance rate was speculative. So if you look at the first SMUD 1 decision, where the court rejected the idea of an exchange for 2003, the trial court did that, and this is in footnote 40 of its March 2006 opinion, the basis upon which it made that ruling was its finding that the acceptance rate was speculative. Well, even if we agree with you, why was it error not to merge, not to have a set-off of the two damage models? Why was it error to have the set-off? Well, Your Honor, the first error was in the court refusing to consider SMUD's evidence that it would have been out of fuel before 2008. So SMUD presented extensive evidence. That's a different, that's not responsive at all to Judge Lori's question. He's saying, assume she did everything right, why was it an error? So, you know, you can't just go back to the facts and say, well, she didn't do everything right. Why was it an error to use the negative number in the second suit against the positive number in the first suit? Your Honor, I think this court's decision in Indiana, Michigan set up the framework that SMUD had to file successive lawsuits for its damages, and because SMUD filed its damages for the first period, which was through 2003, then filed a, at this court's, following this court's framework, followed a second case for 2004 to 2009. They're separate lawsuits, and if the government was able to show in this. Were they separate lawsuits? They were separate lawsuits. The first one held over. Well, the first case was held open, that's right, Your Honor. But there were separate complaints, separate documents. He's saying if they were separate time frames, then necessarily they have to be separate damage assessments, independent damage assessments. I think that's right, unless the court had consolidated the cases for purposes of trial or otherwise, the offset, if the government had successfully proved in the second case that its hypothetical offset exceeded SMUD's damages. If we end up doing what you want, which requires us to vacate and remand, well, I guess now you ultimately want us to force her to give you the first judgment right away, because if we simply vacate and remand, for example, on exchange theory or other things, you realize she could just consolidate the two cases and this argument evaporates. Your argument is on the formality of the different cases, right? And your argument, as I understand it, is not a bad argument. I mean, it's, but it's the formality that there are two separate cases, and in the second case, government didn't counterclaim. They, you alleged breach. If they suffer damages, you owe them nothing because they didn't counterclaim. And so your argument, as I understand it, is the second case is its own animal. You sued them for breach. They can't get money from you. There's no counterclaim, right? That's right, Your Honor. That's your argument. But if she consolidates these two on remand, doesn't that mean that case formality argument, which is a good argument, though, goes away? I think that's right, Your Honor. I think it does. And if she consolidated the cases on remand, I think that smudged evidence of that the court precluded will show that no offset is appropriate. But I understand the technical argument on consolidation does go away at that point, Your Honor. Then we're into the economics and the different assumptions in different years and whether the fuel out date of 2004 holds up under your exchange model, right? Yeah, that's right, Your Honor. So now I've heard a lot of exchange model cases, and I see Judge Braden struggling in this record with the exchange model because it tends to assume that a multitude of municipal power associations are exchanging their fuel with each other, and yet nobody seems to be accepting. Everybody's giving out their fuel. I think you see skepticism in Judge Braden on that point. That's right. Judge Braden did express skepticism on the exchange model. This court has approved the model in three cases, Dairyland, PG&E, and Yankee, the same model, and the issue, Your Honor, with respect to who would be giving up rights and who would be taking them is actually a fairly straightforward one. You're saying that's a question of proof, which I presume you'll have a burden on if this goes back and you're allowed to present your exchange's model. You'll have to prove you would have successfully exchanged. That's right, Your Honor, and by way of example in the record at pages 1930 and 1931, there's a chart that our expert put forward in the second case which sets out the amount of excess allocations for each year from 98 to 2005 of the amount of allocations under this court's 1987 ACR that utilities would not have needed to send fuel to. But you're not asking us to decide any of that. You're saying that's what she'll do on remand, right? Well, I think that's right, Your Honor, other than this court has held three times that the model or affirmed the conclusion that the same exchange model provides a basis to award damages to the utilities. Oh, so let me be clear about what you're asking. You're asking us to say that the exchange model is applicable here, but not to make any of the fact findings over how much fuel you would have gotten rid of or how soon you would have gotten out. You're not asking us to figure out the end date when you're out of the business and don't have any more nuclear waste, right? I think that's right, Your Honor. None of that. So what your expert talks about isn't just the model. He walks through and with particularity to these facts says how he thinks it ought to resolve and when the end date would then be. But you're not asking us to wade through that in the first instance, are you? That's right, Your Honor. I just want to make sure. So you want us to order her that this is a valid legal theory, i.e. the exchange rate. Now go apply it and figure out factually where it comes out. Yeah, and this court has in fact blessed the identical model in Yankee Atomic and the two other cases, PG&E and Dairyland. Well, you say the model, but it's not a formula, right? I mean, it depends on the unique facts of every case, doesn't it? Well, yes and no. In fact, the model that was used in Yankee and PG&E and Dairyland actually in those cases reached the same conclusion for SMUD. So it's a industry-wide model. So the model that was blessed in those cases actually reached the conclusion that our client, SMUD, would have been out of fuel in 1999. So the same model, it's not the facts have not changed because the expert is modeling a hypothetical world, obviously, that didn't exist, the non-breach world. So he takes the inputs industry-wide. So the same model that was used in Yankee Atomic and approved by this court was presented in this case. You say approved, is that a fact question or a law question? You say approved by this court. Well. So I'm trying to, I'm just trying to figure out how much you think that we ought to be telling her and how much we ought to be letting her decide under your theory. Well, I would say, Your Honor, that rejection of the conclusion of the exchange model would be clearly erroneous in the second case because this court has said the use of the model to award damages, the same model, the same inputs, is a correct basis for the damage awards in those cases. But was it factual or legal? Because, you know, two different judges could have the identical facts, reach opposite results, and we affirm both of them. So that's what I'm trying to figure out. Is it factual or legal? Well, I think that Your Honor's question is the right one. I think the technical conclusion in each of those cases was this court did not find clear error in the trial court's use of the model to award damages. So that was the conclusion of this court in Yankee Atomic and in PG&E and in Dairyland. Now, am I correct that you would want us to recognize that it was incorrect for the trial court to offset figures from a later period and apply that to reduce damages at a time when those damages were not even at issue? Yes, Your Honor, that's also correct. That's the point that you're saying is a fundamental error. When those weren't at issue, they can hardly be used to offset that from a later period. It isn't just timing. It's also trying to match apples to oranges. That's correct, Your Honor. I see I'm in my rebuttal time. Well, if what you just agreed to with Judge Rader is correct, just so that we have a clear record on appeal, do you want to recant the earlier thing I said about consolidation, which you agreed to, to my surprise, which is if she consolidates, you're going to say she can't then use it now? Well, I just want you to, I don't want you to be stopped later from making an argument that you may decide you want to make by virtue of having agreed to something I asked you. Right, Your Honor. So our first request is to have the court, this court, affirm the damage, excuse me, reverse the court's decision and remand with instructions to award the $53 million that SMUD proved in the first case. So in that case, we don't think the court can then consolidate it. Again, here's what I'd like to hear you say. I now, upon reflection, no longer agree that even if this is consolidated, it's okay to offset. I agree with that, Your Honor. Okay, that's, I just want to make sure that that was what you're positioning. Yes. Okay. Thank you, Mr. McDonald. Let's hear from Mr. Damlen. You'll be giving Mr. McDonald back his full rebuttal time. So if you'd give Mr. Damlen an extra three minutes, he'd come out even. Mr. Damlen? May it please the court, I'll follow up on Mr. McDonald's responses regarding the ESOPL issue in this case and this court's prior rulings regarding exchanges. In none of those cases did this court find as a matter of law that the exchanges theory model, whatever you want to call it, had as a matter of law to be applied to the depiction of the non-breach world applied by the trial court. All it did, all this court did in Dairyland, Yankee, Atomic, Pacific Gas, and Electric was find that there was no clear error in the trial court applying the exchanges model, but specifically left for the trial court. For example, in Dairyland, said that it was up to the trial court to determine the speculativeness of such a model and then apply it given the particular facts. The trial court in this case, in the first SMUD case, heard evidence. SMUD argued in that case that they would have used exchanges to advance their place in the DOE, in the Department of Energy acceptance queue. They did not use an expert witness to do that in the first case, but they present a model, but they presented two expert witnesses who presented evidence on exchanges and they presented fact testimony and argued that DOE would have removed all of the spent fuel from their plant in 1999. In the second case, SMUD attempted to relitigate the exchanges issue and the only difference was they attempted to use an exchanges model presented by an expert witness, Frank Graves, who had presented a similar model in other cases. But the trial court correctly found that in the first case, it had already decided the exchanges issue and that SMUD could not relitigate that. And the simple fact that they were attempting to articulate this... But how could this have been, excuse me, how could this have been a litigated issue when the trial court didn't find a fuel outdate in SMUD 1? So the SMUD 1 period ended in 2003, 2004 is the fuel outdate. So there's no...it's entirely different periods with different assumptions. That's even before we get to the 1987 ACR rate, which wasn't established until later. Well, I would disagree that the assumptions are different. SMUD has attempted to articulate the issue as one of fuel outdate, but the underlying issue to which the trial court applied collateral estoppel, we would submit correctly, was the issue of exchanges. And the trial court made that clear when it described its collateral estoppel decision in its 2013 decision at pages 19 and 24 of the appendix. And what it said was, while SMUD has attempted to articulate this as one, as an issue of fuel outdate, the court decided the issue of exchanges in the first case. And there's no... convince us, finding that the facts did not justify its application in that instance. In other words, she didn't even consider it, she just said, it's off the table. Well, just to be clear, the exchanges model that has been referenced in the brief was never presented by SMUD in its first case. That was a litigation decision by SMUD. Mr. Graves had been presenting these exchanges models, which the court has heard about, beginning in 1999. SMUD never used or attempted to present that model in the first case. They presented something, because she made an express holding that it was too speculative. So you can't say they never presented anything, they did. Oh, no, we agree with that. They presented factual evidence and testimony from two experts. They just didn't present the specific model that's been referenced. But then it comes up on appeal to us, and we say she was wrong to say the acceptance rate was too speculative. They didn't appeal the exchange rate, it goes back down to her, and they acquiesced. They said, okay, we're stuck. We didn't appeal it. They basically acquiesced that they waived in the first case, being able to re-litigate exchange rate, even though we've reversed, and the legal landscape is now different by virtue of Yankee and these other cases. But they, I mean, I thought quite generously and rightly acquiesced in that case, but that doesn't, why did that prevent them from raising it and fully litigating it in a totally separate second case, especially in light of the fact that that model has now been expressly endorsed on three separate opinions by our court? Well, a few points. This court only found, as a matter of clear error, that the trial court had not clearly erred in accepting the premise of that model and exchanges. In all of those cases, the plaintiffs had argued exchanges and used that model in their first case, not in second cases or third cases. It was an issue when the court was deciding issues of causation. I don't understand. I guess part of what bothers me is you want to have it both ways. You want her to reconsider the $4.1 million offset and raise it to $7 million. But, and even though that was done in the first case, she can't go back and look at the exchange theory again. How do you justify the consistency in those two positions? Well, we would submit they're consistent. In the first case, just speaking about exchanges, the court was presented the argument of exchanges, was presented evidence by both sides, and entered a decision regarding exchanges. There was never a time or temporal limit. The decision was it was too speculative. Well, in part, correct. And then... But I didn't see anything else. She didn't rule against them on the merits of the exchange rate. She said it was too speculative. Well, but that was a ruling on the merits that they failed to prove. Right. Because it was too speculative, that they would have exchanged. Therefore, the only thing the court is left with at that point... Isn't part and parcel of that the acceptance rate, though? So I guess what I'm wondering is, if she found as a predicate that the acceptance rate was too speculative, doesn't that sort of, you know, I don't know, the leash on the dog pulling him along, that the exchange rate therefore has to, as a matter of law, have been too speculative, too? Because if one part of it is too speculative, how can you say the ultimate thing is not? And that would be correct, but on remand, the court, because this court directed the court to use a 1987 ACR rate, even if there was a question about the court's prior ruling on exchanges, the trial court, as it explained in its collateral estoppel decision, reaffirmed its exchanges decision on remand with application of the 1987 ACR rate. With all these questions changing, the law changing on the acceptance rate, the three intervening cases which accept exchange as models, how is there a full and fair opportunity to litigate here? And where's the final judgment to which this is essential? It seems to me like there's a lot of holes in the collateral estoppel theory. Well, on those two issues, the finality issue, the issue of exchanges was litigated in the first case. I don't think there is a dispute about that. And then on remand, the court reaffirmed that decision by application of the 1987 ACR rate. And the court explained that without its decision on exchanges, it could not have awarded or reduced smudge damages by the 2003 wet pool offset, because the assumption is the fuel is still in the pool, and therefore the offset is correct. Smudge was aware of it. Now, they presented that, well, we acquiesced, we walked away and just wanted to get our money. But in the litigation, the basis for the court awarding or reducing damages by that 2003 wet pool offset was its rejection, even after the change of the 1987 ACR rate, its rejection of exchanges. And there is nothing in the court's decision, and we would submit in this court's precedent, that barred application of that decision to the subsequent litigation. The finality was because the court had, both before the remand by this court and after application, fully considered all the evidence on the record. The evidence that smudge had presented was in the record both before and after the remand. And this court's decisions in the three decisions it referenced on exchanges never changed the law, we would argue, on exchanges. And counsel had... But the fuel out dates litigated and found to be 2004, doesn't everything change based on that? No, Your Honor, because while the trial court did not specifically find a fuel out date of 2004 or 2008, as the trial court correctly explained, that didn't matter because it had already ruled and rejected the exchanges argument. If we don't agree with you, I want to move you along because there's a lot of issues, what happens? If we don't agree with you, if she was wrong on collateral estoppel, tell me where we are. If the court was wrong on collateral estoppel, at most the court, we would submit that the court would remand, and then the court would have to then, if this court said you improperly collateral estoppel from presenting the exchanges argument in case two, the court would then have to consider that evidence and reach a new determination as to the effect of the exchanges on the second SMUD claim. SMUD in its appeal... Which would result if she were to apply the exchange model in a likely different fuel out date that would affect the ultimate damage award. Potentially, potentially. Now, at the trial court level, there has been at least one court, Kansas Gas, that we referenced in our brief, where the trial court judge rejected the same model that SMUD is attempting to present here. Who was the trial court judge? I believe it was Judge Williams. I need to check that. That was a case about two years ago. What was the case, ma'am? Kansas Gas and Electric. And there have been a number of other cases, for example, Portland General, even the Dairyland case here, where the court has not accepted in whole the argument that plaintiffs have presented on exchanges and have substantially reduced, in Portland General's case, by $30 million to account for the cost to exchange. So, can I get you, if we... So, if we vacate and remand, like you're suggesting, what about, though, the issue of the combination? I mean, these cases have not been consolidated. You did not counterclaim for damages in any way in the second case. So, why do you get damages in the second case, which is what she's giving you, by virtue of the formality of having two separate cases? Well, first, what the court is offsetting or reducing is not damages in the sense where we are seeking, as there might be in other cases, a counterclaim or a set-off. But suppose there was no first case. Could you have gotten $35 million or whatever it was out of them in the second case? If there was only the second case at that point in time and the amount of the avoided cost offset exceeded their awarded mitigation damages... Would it zero it out? If she didn't file a counterclaim... It would zero it out in that case. But, given the situation in this case that was presented by the trial court, it kept the first case open specifically because... And this is before someone has even filed their second claim. ...and recognized that the avoided cost offset for the second case could exceed... I understand logically why she did it. I'm just not sure it's legally proper. And that's where I'm trying to get you to go. I understand all the logic behind it. But when you have the formality of two separate cases, is the judge really permitted to take and say... Because she effectively gave you a $30-plus million judgment in the second case and used it to offset the first because it's not the same case. Maybe it should be, but it's not. So, I just don't know that that's legally proper. Well, two points. First, when the trial court decided to keep the first case open, everything else in that case had been resolved. And it was kept open for the sole purpose of accounting, if necessary, for the avoided cost in the second claim, which covered costs for 2004 to 2009. After that... But she couldn't. That case, by law, by our prior precedent, she was not allowed to look beyond 2003, right? This wasn't a matter of discretion. For purposes of damages, though, Indiana, Michigan, in this court issue, prior to the litigation of a lot of these trial court cases, simply set the framework for when, to which point in time, a plaintiff could claim damages. Because of the nature of the partial breach cases, this court, while applying its existing precedent, said, for each case you bring, you can only claim your actual incurred damages through the date of the writ or through the time of trial. And that subsequent damages would be left for future cases. Those cases did not address avoided costs. And in this court's cases where it has addressed avoided costs, it never... What you're going to the heart of is the idea we might have been wrong earlier when we said, no, this has to be two separate cases. But I can't find any legal basis for, given the formality of it being two separate cases, using the 30... Logically, they're going to get a huge windfall. I mean, they're not, because you didn't pay interest for all these years. But they are going to get a huge windfall. If this had been one straight case all the way through, no doubt you could have applied the $35 million or whatever it is, back against the other. But here, I mean, I've got to abide by the law. Precedent is clear in two separate cases. Is there any Supreme Court or other precedent that you can think of, even outside of this context, that allows you to do that in two separate cases? Because I don't see it here. So am I missing something elsewhere in the law? Well, there isn't a case on point that we could find that said one way or the other. But I would submit this. When the trial court made that decision to hold open the first case, somebody did file a petition for writ of mandamus arguing that the trial court had abused its discretion in doing so, and was preventing them from- Yeah, but we concluded you had a remedy because you could bring it up later. You know, but that's the end of that. Although this court was aware of the argument in why it was being held open, and denied the writ, finding- But it's a whole different standard. It's extraordinary relief, not otherwise attainable elsewhere, and we decided it was attainable through this. Correct. But the courts, I would submit that overall, the courts present regarding breach of contract damages, for example, in the Blue Bonnet type cases, to measure the net financial effect on the non-breaching party in this case, required fully accounting for all of the avoided costs without keeping that case open, and if you will, applying the offset to both cases, understanding they're separate cases. That net financial effect could not be accounted for in this case. And further, in the cases like Southern Nuclear, where it directed, in these particular cases, application of avoided costs, the result would be if the avoided costs offset, in this case it happened to be $35 million, was not accounted for over both cases. It's a windfall, I get it. That would be the case, and it would allow a plaintiff, now, again, there's not a lot of cases like this, but it would allow the plaintiff to say, they're going to bring the second case, and we know the avoided costs are going to exceed the damages. Yeah, they could place out the years to really- Correct. Net gain in the end. That's a concern, and by accounting for this, in keeping the first case open, we would submit, there's no abuse of discretion in the court doing that, that it was within its discretion to account for, not only damages, but also for all of the avoided costs. And at the end of the day, I mean, the court's award was approximately $40 million this month. They're not, it's not zeroing out the- Could I ask you to turn to the offset issue? Yes. The wet pool actual offset number, not the time period, but the conversion from $4.1 to $7 million. How does she do that in the second case? Let me go back. In the first case, there was only one year where SMUD had moved its fuel from wet to dry storage in 2002. So the argument was, they moved to dry storage, so then they are avoiding or saving their avoided wet pool costs. Actually, let me be clear. I totally and completely understand how she came to the $7 million number, and you know what? I think it's probably the more correct number, to be honest with you. I just don't know how it isn't law of the case, already decided and stuck at 4.1. Whether she was, you know, I think basically she revisited herself, realized that it was unaccounted for cost of maintenance of the dry storage and should be put in, and if she had done that in the first instance, I probably would have affirmed it without any difficulty. But the question is, why isn't it already set? How does she have the right to go back and do that at that point in time? Because in the second case, the specific damages that were claimed were for 2004 to 2008, and the avoided cost offset had to be looked at specifically for those years. But she applied it backwards, too, right? Didn't she apply it? Did she apply the 7? Did she keep the $4.1 million number for the first period, too? She did. Yeah, the $4.2 million for the 2003 wet pull offset was never changed. And it was never appealed by either the government or SMUD. But that was in the nature of why the trial court kept the second case open. And SMUD itself had argued that the court could not determine not only damages in the second case, but avoided cost because those particular facts had not yet been litigated. The government, in the first case, before SMUD filed its second case, had requested basically a future wet pull offset. Knowing that the fuel was in the pool for 2004 to 2008, we asked that the court award us. But it was fully litigated the first time. That's how she got the $4.1 million number. For that particular year. If I can give an example, the converse would be SMUD is awarded a certain amount for dry fuel storage operation and maintenance for 2003. That's identical. You say for that year. You didn't present for the second time period anything different than what you presented for the first time period. The facts are identical. Why isn't it an abuse of discretion for her under the identical facts with the identical parties to reach a different conclusion the second time around? Because in the second case, we presented evidence that the total avoided wet pull cost was in the $7 to $8 million range. You did in the first case, too. Well, we argued for a higher number. But for that particular year, the trial court rejected that. So you argued for a higher number saying you're not accounting for the maintenance and operation of the dry storage, which you have to. Because look, even their expert admits that under the wet pull $4.1 million number, that's not included. So I guess the identicality of the arguments seems to me to be different. Well, the argument was slightly different. And I apologize, I'm past my time. I apologize to my colleagues. Go ahead. Let me just finish with one answer. In the first case, we argued that SMUD should not even be able to recover its incurred dry fill storage costs. And the court specifically rejected that. That's what SMUD has framed as its double deduction. But what we did in the second case was articulate the total avoided wet pull cost. In the first case, all we were able to articulate was the savings. And we said in case two to the court, the total avoided wet pull cost has to account for not just the savings, but the total operating costs that SMUD avoided. And that's what was presented. That issue we would submit was not decided, or we were not precluded from arguing that in the second case by the court's decision in the first case. Mr. Danlin, as a matter of fact, the government has not paid a cent here yet. And also has not taken a single canister of spent nuclear fuel. Isn't a lot of the difficulty you're describing here a problem of your own creation? For purposes of assessing damages and the issues in this case, I would submit no, Your Honor. There is no dispute as to what is happening in the actual world or the mitigation activities SMUD undertook. Does the government have a plan to bring this to an end at any time? Or does it have a different theory of how to perpetuate this? Well, in terms of the actual acceptance of spent fuel, I would have to defer to the Department of Energy. I mean, there are ongoing plans. In terms of the litigation itself, there have been 88 cases filed in the trial court. There have been a settlement and resolution of, in the neighborhood of 75% of those. So there's only a portion of these cases being litigated. But in bringing it back to this case, that's why these issues of collateral estoppel and finality are important, not only to plaintiffs, but to the government. To when issues have been decided, to have those be final and resolved for ongoing cases that are still litigation. But you open the SMUD 2 case asking for an offset against another case. Well, ultimately, yes. Kind of undercuts your efficiency claim a little bit. Well, we were expeditiously resolved. That case was expeditiously resolved. And the court understood that. And there was no undue delay, I would say, on either party's part to litigate that case. And ultimately, we would submit that both cases can be resolved efficiently. And the trial court did its best to do that. Thank you, Mr. Damlin. Thank you, Your Honor. Mr. McDonald, you have your rebuttal time. Thank you, Your Honor. In Mr. Damlin's remarks, he mentioned that on remand, the trial court, I think he said, reaffirmed the finding on exchanges. And I just want to be very clear that on remand, SMUD argued to the trial court, this is an issue, whether the government's entitled to an offset for 2004 to 2008, that is an issue that we will litigate in the second case. And the court, in its actual remand decision, recognized that that was what would happen. Objectively read, we understood we would get an opportunity to litigate the government's entitlement to a wet pool offset for 2004 to 2008. I don't think in any way, shape, or form the record can be read. Entitlement to, but not necessarily a redo of the quantification of the offset amount. That's right, Your Honor. That was your understanding? That's right, Your Honor. And as to the question that Judge Rader, you were just asking, SMUD hasn't received any damages. The court in 2009, on remand, determined that SMUD was entitled to $53 million. We think that if the government were right and they could reopen that on remand, then SMUD should be able to get additional damage. Because actually, under the exchange model, SMUD has an entitlement to about 20 million more damages. Because the model. In the first case. In the first case. That's right, Your Honor. Well, you missed one of the money, because the interest will eat it all up by the wait for us. Every year has cost SMUD and its municipal owners more than $4 million a year, every year since 2009. That was one of the reasons we were prepared to take the $53 million and go home in 2009. And each year going forward, that has cost SMUD that rate of return and its use of that money. So if, on remand, we were going to reopen the issues, then SMUD, I think, would be entitled to say, under the exchange model, which this court has adopted, it would have been out of fuel in 99. And therefore, it's entitled to the wet pool cost that it actually incurred in the real world for 2000, and 2001, and 2002, and get back the wet pool offset for 2003. So that is a Pandora's box. And if it's opened, we think SMUD will be entitled to $20 or $30 million more in the first case, besides just the $53 million. Mr. Damlen also mentioned- You're not asking us to do that. You're saying, just give us the money and let us walk. That's right, Your Honor. And if it gets reopened, we'll, unfortunately, be faced with that scenario, where SMUD will seek those damages. Mr. Damlen mentioned the fact that there was essentially satisfied the final judgment standard for SMUD 1. And obviously, there wasn't a final judgment in SMUD 1. They tried to get in under the sufficiently firm slide in and say, well, it's almost final, sufficiently firm. I think that the fact that the trial court took $14 million away from SMUD at the end of SMUD 2 from the SMUD 1 case shows that it couldn't possibly have been sufficiently firm for purposes of collateral estoppel. On the full and fair opportunity, again, SMUD didn't have that opportunity in the first case to litigate about whether there was an offset. SMUD was complying with the Indiana-Michigan case. This court's decision that you litigate each case as it comes up through 2003 had no reason to litigate about 0405060708. So it didn't understand that the trial court would consider that in the second case. So for all those reasons, we think the court must reverse, instruct the trial court to award SMUD $53 million for the first case and $22 million for the second case. And I don't have anything further unless the court has questions. Thank you, Mr. McDonald. Thank you. That concludes our morning.